May it please the court, my name is Deirdre McDonald and I'm here today representing the petitioners in Alaska Wilderness League v. Kempthorne and the petitioners in the resisting environmental destruction on indigenous lands or red oil v. Kempthorne cases. Mr. Winter is seated at the council table with me today. He is representing the North Slope Borough and the Alaska Eskimo Whaling Commission. We'd like to reserve five minutes of our time for rebuttal and we will split the remaining time equally. Mr. Winter is going to address the subsistence concerns raised by this project, discuss the reasons an EIS was required for this project and address any questions related to jurisdiction. I'd like to focus on the EIS. Let me ask in that connection, is it really realistic to expect the agency to generate a, at this stage of the process, only has 30 days, a full EIS? Yes, I believe that it is. In the relevant provision of OXLA, when the Congress passed the statute, they explicitly provided that NEPA applies. They did not want NEPA to be in any effect. And here, both statutes can be applied equally. So if there are significant How is it possible? Don't you have to have public hearings under NEPA? Yes. Well, the way that it's possible is, as recognized in the agency's regulations, the clock does not begin to run until the matter is deemed submitted by the agency. During that initial phase, when it's collecting information from the lessee, it's recognized that the lessee has a role in helping the agency to comply with NEPA by gathering and submitting this information. So the NEPA process can be began with the assistance of the information submitted by the lessee before the agency deems the application submitted. So therefore, it's perfect. But then don't you have to give notice and have a public hearing? Yes. Well, how do you do that in 30 days, if you get the information? Well, preparing the environmental impact statement would be part of the process of gathering information. And once the statement was completed, then the agency could deem the process complete, the application submitted, and then it would have 30 days to issue its final decision. So you're saying that 30 days doesn't start until the EIS is complete. In a case where there are potentially significant impacts and the agency needs to prepare an EIS, yes, that's correct. Because otherwise, you would have to read OXLA to repeal NEPA's requirement by implication. You'd have to read OXLA to say, even when there's potentially significant impacts, you don't prepare an EIS. And contrary to reading a repeal by implication, which are disfavored, Congress has explicitly said NEPA does apply here. Well then, let me ask another question. Doesn't the tiering process encourage the agency to do large-scale EIS early on and then streamline its analysis at the exploration stage? Yes. I completely, full-heartedly agree with that. And what the OXLA cases say in the context of the tiering process, this Court has said that at the lease sale stage, the MMS can prepare a general-level analysis so at the site-specific stage, it can focus in on the issues that are right for decision. Here, that didn't happen. You have a short cursory EA that doesn't look at the actual effects of Shell's proposal to drill here. The general analysis is acceptable at the lease sale stage because there's no commitment to allow activities in the water that can harm the environment. When you get to the stage of approving an exploration plan, then there are potentially impacting activities and the analysis has to focus in on the actual proposal. Here, you have a cursory EA that looks at the effects on whales and completely refuses to analyze the potential for a crude oil spill and its effects on the environment. One question I have is, one of the complaints I gather that you have is that it's only for the 2007 drilling that the company tells you the precise location of the wells and doesn't tell you the location for 2008 and thereafter. The company says where we're going to put the wells and how many in 2008 depends on the results of our drilling in 2007. Now, how do you solve that problem? Well, that claim goes to the requirements of OXLA itself, and OXLA and its regulations have laid out the requirement that the company has to submit specific information about well location and well spacing. There's nothing about location or spacing when you have an  How do they do that? Let's assume that it's correct that they won't know that until they see the results of the 2007 drilling. Is there a way to solve that problem? Well, they could apply for a new permit to drill based on So you're saying that they would get one permit for 2007 and then a separate one for 2008? Well, yes. It's within their choice. If they want a three-year permit, that's fine, but they need to provide specific information, not request a blank check from the agency. And the alternative is to get a permit each year? Yes. Now, going back to the inadequacy of the analysis in the EA and its failure to look at the actual proposal, the fact that MMS here points back to the general analysis it did at the lease sales stage and saying, here's our adequate analysis, just belies the fact that it's not in the EA. I'd like to examine the two issues, the bowheads and the oil spill analysis, and show how that shows the inadequacies of MMS's approach. In the case of the bowhead whales, the multi-sale EIS they're looking at looks at general past information and studies about the effects of noise on bowhead whales. And what that information shows is that those effects can be significant. In fact, it actually says in the multi-sale EIS, and I'd like to quote from it, effects of an actual icebreaker on significant. And that's located on page 124 of the supplemental excerpts of record. The multi-sale EIS then goes on to state that to find out how significant the impacts will be, things like the time and location of the activities need to be considered. This is what needed to be considered in the EA, but it was not. In the case of oil spills ñ Before you go any further, and educate me if you would, where the prior studies were, as they say, tiered on, your complaint is that they didn't do a study as to the specific location where they were going to drill. They just did a general study as to what kind of drilling was going to take place. My question is this. Were there any peculiar geological formations or geographical formations at the sites where the drilling is to take place, which are significantly different from where the overall studies were made on which the conclusions were tiered? Yes, Your Honor, I believe there are. The unique features that need to be looked at first are the location, which is right in the middle of the Bowhead Whale Migration Corridor. Second, the fact that Shell proposes to have two drilling rigs operating simultaneously within the Migration Corridor at the same time the whales are migrating. In addition to the specifics of the geographic location, what the agency needed to look at is the specifics of the actual drilling proposal itself. So in the multi-sale EIS, they talk about a particular icebreaker, the Robert Lemurier. They don't talk about the large-scale icebreakers that are going to be used here, which are in fact bigger. They need to look at these icebreakers, what is the noise output of these icebreakers, where are they going to be operating. So far you've told me that the difference is that the location of the drill will be in the middle of the whales' path and the different icebreakers. I guess I'll try again. Was there anything different about the geographical and geological formations where the drilling used to take place, which would make the noise greater or lesser? Well, the noise can vary in site specifics. That's exactly when I was quoting the moment. My question is, did you introduce any evidence that shows that the noise would be greater where the drilling was to take place than the place where the multi-sale surveys were taken? No. No, we did not. I don't think so. But the multi-sale says that you need to look at the time and location and various factors. I will address any further questions on rebuttal. I'd like to leave the time to Mr. Winter. May it please the Court, my name is Christopher Winter and I represent the North Slope Borough and the Alaska Eskimo Whaling Commission in case number 0772183. I'd like to address two central issues for the Court today, if I could. First, I'd like to discuss the potentially significant impacts to the bowhead whale hunt and the need to pair an EIS to address these potentially significant impacts. As a part of that discussion, I'll touch on the so-called mitigation measures and why these measures do not support MMS's decision to forego an EIS in this case. Second, I'll discuss the level of controversy and uncertainty which provides a related but independent basis for the Court to require an EIS in this case. The Minerals Management Service simply does not know enough about the potential impacts to the Arctic environment to approve a three-year exploration plan on environmental assessment. With respect to the subsistence hunt of bowhead whales, it's useful to step back and look at this case from the big picture for just a moment. There are several facts that are undisputed by the parties. The first fact is that bowhead whales are very sensitive to underwater noise and they can be deflected from their migration routes as a result of drilling and ice breaking activities. The second fact is that the deflection of whales from their normal migration routes creates a risk of death and serious injury to the whaling captains and their crews by forcing them to travel further into the Arctic Ocean in order to meet their quotas. It also threatens a key source of food for their families and communities. Third, the exploration activities are planned in the middle of and adjacent to Inupiaq's traditional subsistence hunting grounds and they open up... Say that again, I didn't get you. The exploration activities, as proposed by Shell, are located in the middle of and adjacent to the traditional subsistence hunting grounds of the Inupiaq whalers. They are coincident in time and space with the hunt and as MMS stated in the multi-sale EIS, it's extremely important, especially with respect to subsistence, to consider the site-specific nature of the exploration activities and whether they overlap in time and space with those activities because it's the specific timing and location which can interfere with the subsistence hunt because the subsistence activities are very limited based on the time of year and the location at which the Inupiaqs are able to access those resources. Based on those facts, the Minerals Management Service concluded in the environmental assessment that the drilling and exploration activities may have a significant impact on the subsistence hunt of bowhead whales and this concession by the agency is found in the environmental assessment at the excerpt of record at page 1075. So given the fact that the agency concurs that there may be a significant impact on subsistence activities, MMS must show that the mitigation measures will reduce that level of impact below the significance threshold in order to avoid preparation of an EIS in this case and this standard comes from the National Parks and Conservation Association case at 241F3-722. Furthermore, the court must rule on the record that it was before the agency at the time of its decision. Now in this case, the Minerals Management Service cannot make that showing. MMS has not imposed any specific mitigation measures on Shell as a part of this project. Instead, the agency has deferred to a future process that hopefully would result in the limitations have not been established and have not been detailed by the agency. Are there any mitigation measures that would satisfy your concerns? Hypothetically, there certainly is the possibility of developing a mitigation plan that could prevent significant impacts to the subsistence hunt, but that has not been done in this case. The agency simply has not told us what those measures would be and we would need to have a discussion with the agency about whether they have been tested and whether they are adequate and provide a level of assurance for the inubiates. Would that be part of the EIS? Absolutely. That would be part of the environmental impact statement process. Now, when you say mitigation plan, are you talking about a monitoring program? They do say, I think, that it depends on a monitoring program. Yes, Your Honor. Are you saying the monitoring program has to be more specific? A monitoring program could be part of a mitigation plan, but simply monitoring and identifying the fact that bowhead whales are being deflected from their migration route does not do anything to address the impacts of the subsistence hunt. Once we know that whales are being deflected, that has to be coupled with some limitations on the project, which ensures that that deflection will cease or that it will never have occurred in the first place. But I assume they say a monitoring program so that they will then take action when they see under the monitoring program that there's an effect. Are you saying that you need an EIS or some agreement in advance about what action would be taken? I think that's right, Your Honor. I think we don't have that before us, what that would be, but it could, for instance, be a limitation on the amount of underwater noise to be generated in the first place. It's important not to deflect whales from their migration route to begin with. Once the whales are deflected, it's highly questionable whether we can simply turn off the noise of an active drilling vessel or stop the noise of an active icebreaker if a drilling rig is threatened by pack ice to then bring the whales back in the normal migration route. So mitigation, as an example, would include a limitation on the amount of underwater noise to avoid deflection in the first place, coupled with a proven monitoring program so that we can identify when that deflection has taken place, coupled, again, with some type of response if that deflection is occurring in order to assure that the hunt can continue. Another possible mitigation measure would be simply seasonal restrictions on the activities so that they would not take place. Prevention as opposed to mitigation, is that what you're talking about? Well, no, I think a seasonal restriction could be a mitigation measure, and that could be designed into the project. And I think that could also be another alternative, which, again, we don't have before us because that was not included by the agency. So again, the mitigation measures, the conflict avoidance agreement, and stipulation number five, which is a backup in the event that the parties are unable to reach a conflict avoidance agreement, don't provide any specific measures for the agency to assess for the agency and the public to know that, in fact, these admittedly potentially significant impacts will not occur. You have just a little over two minutes. Do you want to save time for rebuttal? I will. I'll save the remainder of our time for rebuttal. Thank you very much. May it please the Court, I am David Shulton, representing the Minerals Management Service. I will be sharing my time with the intervener. I'm going to try and take about 12 minutes. Let me just start with the mitigation question, since we were just discussing that. The lease here imposes very specific mitigation measures, and one of them is the conflict avoidance agreement requirement in stipulation five. And under that, the intervener shall must sit down with the subsistence whalers and hammer out an agreement to protect their subsistence whaling. And that is something that's been done over the years successfully with various types of operations in the Arctic, and it's protected the subsistence whaling hunt. As the EIS notes, they've been able to reach their quota each year. And in fact, this year there was an agreement, a conflict avoidance agreement, which would have had Shell pull all of their assets off of the drilling for the time that the whale hunters were out there. So that's specific mitigation. Another specific mitigation measure is the requirement that Shell get an incidental harassment authorization from the National Marine Fisheries Service. That's again something they must do each year, and the National Marine Fisheries Service applies a very strict standard in giving those authorizations. Shell must be able to show that its operations for that year will cause only a negligible effect on the stock of whales. And so that's another method that has proven very effective over the years in preventing adverse effects to whales. There are other mitigation measures as well, but I think this is a very different case than the Glacier Bay case that they mentioned, in that here the mitigation is specific. It's been tested. It was evaluated in the multi-sale EIS and found to be effective. Let me also address, if I may, the question that came up about the 30-day window that's available for doing an exploration plan approval, and I think that's important. The way that the Minerals Management Service integrates the Outer Continental Shelf Lands Act with NEPA and achieves the objectives of both is to use the concept of tiering. And under that, at the exploration plan stage where it only has 30 days, it does an environmental assessment which tiers to the lease sale EIS, in this case we call it the multi-sale EIS. But I think what petitioners have wrong here is they say that that's a very generalized EIS. Well, in fact, I think if you look at it, you'll see that it is quite specific to the type of exploration and the type of activities that were planned by Shell here. The multi-sale EIS says that it is considering exploration that would take place with two drilling units, two floating drilling units at the same time with associated ice breakers, and it studies that and finds that that would not have any type of significant effect on whales and it bases that on studies that have been done in the Beaufort Sea of the earlier exploration. There have been at least four years in this area where exploration very much like what and that's taken place, there's been extensive monitoring, aerial monitoring, they've watched where the whales are as they migrate through, they've charted them, and what those studies show is that whales will divert somewhat from where the drilling rigs are because of the noise, but that it does not affect the overall migration and that it doesn't have any adverse effect on the whales if they do divert, they're simply going around the noise, it has an effect that they're feeding or other important behavior, and the EIS concludes that the energy expended in going the small extra distance around where the drilling takes place is not significant in terms of the overall energy needs of the whales to get to where they're migrating to, which is the Bering Sea, so that's been carefully looked at and in terms of the very type of activity which Shell was proposing under its exploration plan here. So perhaps you can help me here, doesn't the effect on the bowhead whale depend on the specific location of the drilling? Not very much, Your Honor, because... Not very much, what does that mean? Yeah, well, the bowhead whale corridor goes of course across the Beaufort Sea, so it encompasses this entire area, so whether the drilling takes place at one particular longitude or another is not particularly significant for the whales, and I think it's important that in several different areas of the Beaufort Sea before, and has not been shown to have any ill effects, so I think it's safe to conclude that the particular location of the drill rig doesn't have a significant effect on how the whales react to the noise, and they are basically passing through the area. So the Shell did specify in its exploration plan exactly which 12 leases it wanted to explore on, the petitioners have said, well, they didn't supply exactly where within those leases they were going to drill in the second and third years, they did it for the first year, but the leases are only 9 square miles, and in the context of the Beaufort Sea, that's a pretty small block, so they did pin it down to the extent that they could, but they need to get more data, both from seismic studies and from whatever they discover the first year before they come to MMS with exactly where in that 9 square mile block they're going to drill in year 2 and year 3, MMS will have a chance to look at that, mainly for purposes of making sure there's no particular hazards on the seafloor bottom, but whether it's on one side of the 9 square mile block or the other really doesn't have any significance as far as the whale migration is concerned, but in any event, MMS requires there to be extensive monitoring so that if there were any ill effect on the whales, they would be able to pick it up, they're doing a good job. Yes, but after the harmful effects have taken effect, I mean, or occurred. Well, I think they will be able to see if, for instance, there was any indication that the whale migration was being blocked or stalled, they would be able to pick that up through the aerial monitoring and MMS has the authority to tell Shell to stop, stop drilling or reduce drilling so that the whales can proceed on. There's never been any evidence that that's ever happened, but if it does occur, MMS has the ability to deal with it. So I think with all of the mitigation measures in place, it's safe to conclude, and not only MMS has concluded, but also the National Marine Fisheries Service has concluded in its biological opinions where it's found no jeopardy to the endangered species, including the bowhead whales, they've found that there won't be any harm, Fish and Wildlife Service has found no significant harm to the species under their jurisdiction. So it's not just the MMS that is making these findings. If the Court has any additional questions, I'd be happy to answer, otherwise I'll leave the rest of my time to the intervener. All right, I have a question about the regulations requiring Shell to identify its well sites before the agency can approve an exploration plan. Isn't that right? There is a regulation, and as we've pointed out in our brief, there is a regulation which basically says that on a case-by-case basis, Minerals Management Service may determine that a particular piece of information need not be provided if it's not necessary for their decision on an exploration plan. And they invoke that here, deciding that they didn't need the exact location for years two and three, it was enough to have it for the first year. So the MMS's regulations permit that to happen. And I can give you a site to that regulation, that's 30 CFR section 250.201. So that basically gives the agency the flexibility to decide that a particular piece of information isn't vital now if it gets provided later. Well, under 30 CFR 250.211B, that I have here, says, Federal Regulatory Enforcement regulations require that an exploration plan include, quote, a map showing the surface location and water depth of each proposed well and the locations of all associated drilling unit anchors. So isn't the agency supposed to consider the location of the drilling units and platforms in deciding whether to approve a project? Well, that's a requirement that essentially was waived under this waiver provision of 30 CFR 250.201. MMS can decide that any particular provision like that, that that information is not necessary and that's what it decided here because it had the specific location for the first year and would get it for the future years. And I would stress that this is the approval of a plan. But Shell, each year, when it's going to drill a particular exploratory well, has to produce an application for a permit to drill. And so that process will occur at the beginning of the second year and the beginning of the third year. So MMS will have an opportunity to look at the exact locations at that time. They just determined they did not need that at the very beginning in approving the plan. And when they get their permit and say precisely where they're going to drill, is there some mechanism to review whether that particular location, when there's use of icebreakers and drilling rigs, will cause significant harm by way of noise to the bonehead whale? MMS can look at that. The grant of a permit to drill is generally, there's a categorical exclusion which generally covers that, but the categorical exclusion makes clear that it will not apply and they must do environmental analysis if there are particular circumstances and one of those circumstances is a potential impact on an endangered species. So there would be an opportunity there, if necessary, that MMS could do an environmental assessment. Also at that point, the National Marine Fisheries Service would be taking a look at it. But your position would be that the multi-sale environmental assessment has covered this area sufficiently and unless the person requesting a further analysis could show that the area there was something peculiar about this particular drill site as opposed to the ones that have already been approved, there wouldn't be any necessity, you'd be entitled to a categorical exclusion. Yes, I think that's essentially correct, although the only thing I would say differently is that MMS recognizes that it is its obligation to look at whether there's something peculiar. It wouldn't require the petitioners to raise that. Thank you. Good morning. If we might, we've provided a map straight from the record. Could you state your name, please? Oh, yes, sir. Kyle Parker. I'm here on behalf of Shell. We've provided a map to the court today straight from the administrative record at AR 1275A. The reason we've provided this map out of the record is to illustrate for the court the fact that we have had over 30 wells drilled in the OCS in the 30 years of leasing and exploration activity out in the OCS. In regard to our specific project, we have had 12 wells drilled in the immediate vicinity of our location, the location identified in our plan of exploration as Savulik. What's important to note here is that Savulik is actually the Hammerhead well that was drilled in the early 80s. There were two wells drilled at that location. We are going back to the very location where the Hammerhead wells were drilled, the very lease, and we are drilling wells at that location. In addition to the Hammerhead well, we've got three Kuvlum wells immediately to the east within 20 miles of our location. We've got the Wild Weasel well also within 20 miles of our immediate location, and then two additional wells at what are called Galahad and Corona that were drilled in the immediate vicinity of our location. You're going a little bit too fast, and you know too much about oil and too much about drilling. Sorry. Now, why don't you tell us what you're saying. We see here on this exhibit an area lined out in red. Should we be looking at that? Because I'm thinking that if it's important, it must be in red, right? The lines on the map are different areas that the agency has offered for lease over the years. Our lease sale area, in other words, the one that's addressed in the multi-sale EIS, the one that's at the foundation for our plan approval, if you look at the green line, there's a dark green line on the far extent of this map. That's the biggest one? Yes, it's the largest of the lines. There's an area that's kind of a gray color, and that's one of the original planning areas. Your 30 wells have been drilled within that green area? I'm sorry? Your 30 wells have been drilled in that green area? Yes, sir. Where are the 12 wells that are covered by this multi-sale lease? If you look inside the red line, about two-thirds of the way over to the right, there's a well called Hammerhead. It's denoted Hammerhead No. 1. It's just inside the red line. I hate to take your time, but it doesn't add clear to me. Is he Corona No. 1? If you're at Corona, if you come to the left and down. I see Hammerhead No. 1. Yes, sir. Hammerhead No. 1, that is Savulik. That is the prospect that Shell is going back to drill on. The importance of the fact that we've got two wells drilled at Hammerhead. We have three wells drilled immediately to the right at Kuvlum, and again, another well drilled at a prospect called Wild Weasel. That name is down in the yellow onshore, but there's the black dot immediately below Kuvlum, and then again, the Corona and Galahad wells. The significance of those is that all the data related to the drilling of those wells, all the data related to the interactions with the whaling, all the data related to the ice management activities that took place during those open water drills, all of that is encompassed in the three-volume multi-sale EIS that forms the basis for our plan approval. So, we are here today to tell you that the multi-sale EIS and a close reading of Section 4 of the multi-sale EIS, which is at the heart of that document, includes an analysis of all the things that petitioners claim were overlooked by the agency. Your Honor, at the start of the argument today, you asked the question about whether the agency is obligated to prepare an EIS in the 30-day period. That's not this case. We have a comprehensive environmental impact statement that was prepared that covers the very activities that Shell has proposed in its plan of exploration to operate here. At all the specific sites? At all of the sites. In fact, we've identified in our plan of exploration, we've identified the 12 leases on which we were proposing operations over the three years of our activities. We have, for the very first year, we identified our four specific locations. We met with the director of the agency and talked about years two and three and the analysis that we would have to complete before we could identify well locations for years two and three. Again, based on the amount of information that we were able to provide with him in regard to the prospects, and the fact that those prospects are in the immediate vicinity of say, okay, Shell, you will come back in years two and three, you will make an amendment of your plan of exploration and provide me with the specific well locations. In fact, he is obligated at that point to go through an analysis and determine whether something we've proposed in years two and three falls outside of the analysis that was done in the multi-sale EIS. Again, this is not the case where we don't have an EIS that was prepared that covers these very activities that were proposed. And importantly, at the point in time when exploration is proposed, if exploration is ever proposed, there's going to have to be another comprehensive environmental impact statement prepared to cover those activities. Our exploration project is limited in time. We're out there from 60 to 90 days in a season. Our operations are transitory. We're not going to leave any permanent facilities on location. We'll have well heads that will be buried subsea when we pull off location. Our activities are not like a logging case where the agency has approved the cutting of thousands of acres of land on an EA through a programmatic EIS and an EA and said, go clear-cut forest. That's not this case. We are going to have to come back and go through the long process of developing a comprehensive environmental impact statement before we can ever go forward with a development project. We are gathering information. We are going out there for a very limited period of time to see what is there, if there is anything there that is worthwhile producing. And that is why the agency has adopted this program under the statute, OCSLA, whereby we do the comprehensive environmental impact statement prior to the sale, covers all the anticipated activities. We come back in with our plan of exploration. Provided the activities we're proposing were analyzed in the comprehensive environmental impact statement, they'll approve our plan of exploration and allow us to go forward with that work, and then we have to come back for a development and go through the whole environmental impact statement process at that point. So let me see if I understand what you're saying, that before you actually begin to drill at any specific site, a complete EIS will be developed? Before we go to production at any location. Not drill. Not before you drill. No. In fact, the plan of exploration that we submitted and which was approved and is the subject of this challenge, we are proposing to drill up to 12 wells over a three-year period, exploration wells, not development wells. Again, once those wells are drilled, just by the very nature of exploration work, those wells will not be used for development. They will be what's called plugged and abandoned in the industry. They're used to gather information. Data that's developed from the completion of those wells will be used to evaluate the actual locations of where any development wells might be located sometime in the future. So you're there very temporarily or somewhat temporarily? Yes. We're there from 60 to 90 days, in a 60 to 90-day period at each location, and then we're gone. Did the EA consider the number of icebreakers, their size and class, their expected noise output? In fact, an examination of Section 4 of the Multi-Sale EIS includes a detailed description of the assumptions that were used to evaluate industry activity in the sale area. And the assumptions that the agency adopted, in fact, had industry going out there and drilling with multiple drilling rigs, including all their support vessels, had multiple development scenarios. They contemplated multiple development scenarios as a part of this. And they evaluated the impact of our proposed activities against the assumptions that they had established there and concluded that everything we were proposing fell within the assumptions that they used there and their conclusions in regard to the impacts of the activities, which were far more extensive than what we're proposing in our plan of exploration. I've exhausted my time. I'm happy to answer any additional questions. Thank you, counsel. Thank you. Taking and following up on Judge Reinhardt's question just a moment ago, do you agree that the Multi-Sale EIS did consider the icebreakers that were going to be used in this exploratory operation and that they would need a full EIS when they go into production on each of these sites? Sir, Your Honor, I think those are two separate questions. The first question is whether the Multi-Sale EIS adequately discusses the noise from icebreaking activities. And our position is certainly that it does not adequately address the noise from icebreaking activities. I'll just give you one example, and that's with respect to the subsistence use of fish, which is a critical – Speak louder. I'm sorry. I'm sorry. I'll just give you one example, and that's with respect to the subsistence use of fish, which is a critical resource for the Inupiats. MMS talks about the impacts from a gravel island, from other activities, but omits any discussion of impacts from icebreaker noise. And it simply was not a main focus of the analysis in the Multi-Sale EIS. And if you look at the section on bowhead whales, similarly, there's a very cursory, if any, detailed discussion at all of icebreaker noise. And so we would ask that the court go back and look at that issue. I believe the second question, Your Honor, if you could just refresh my memory, was? Is he accurate in saying that when you go into production, before you go into production, you're going to have a full EIS as to the well in production? All we're talking about here are exploratory wells which will be capped. Well, I think it's certainly true that once they go into production that they will have to do another EIS, but that does not mean at all that the impacts of exploration will not have a significant impact on the resources or subsistence uses in particular. We heard about the previous drilling activities at Hammerhead, which is in Camden Bay. That is one of the most important subsistence hunting grounds for the bowhead whale hunt. And, in fact, in 1992 and 1993, during those previous operations, it's well documented that those operations caused the deflection of bowhead whales from their migration route, pushed them 20 to 30 miles out into the Arctic Ocean, and the whaling crews had to subject themselves to extremely harsh conditions in small vessels to travel an additional 20 to 30 miles to meet their quotas. And it subjected those whaling crews to extreme risk of death and injury from the previous drilling operations, and that's well documented and discussed in the environmental assessment. And those operations involved a single drill ship and a single set of supply vessels. What we're talking about here are multiple drill ships and multiple supply vessels, which will only compound the admittedly serious impacts that occur to the subsistence hunt from those previous operations. The question is, were in the multi-tiered EIS, did they consider the possibilities of the number of vessels and drills that would be used now? Were those things discussed? Your Honor, if you look at the discussion of impacts to bowhead whales and subsistence in the multi-cell EIS, there is no discussion of, for instance, what is the combined sound output of two drilling rigs located in close proximity with all of the attendant icebreakers. That information is not in the multi-cell EIS. What they did is they summarized information from previous studies that looked at, for instance, seismic activities, which are completely different, which involve underwater pulses of sound from a gun, as opposed to drilling rig and icebreaking activities. And they also looked at broadcast sounds of icebreakers, which they admit were much lower in volume than what an actual icebreaker would emit. And so there is no discussion in the multi-cell EIS of what the sound output would be of two drilling rigs and all of the attendant icebreakers. And what about in the current EA? The EMS admits in the EA, it says, all of these previous studies looked at the operations of a single icebreaker from 1992 and 1993, a single drill rig, and it's unknown what the impacts will be from two drilling rigs in the support vessels. So the agency admits in the EA that increase in operations renders the potential impacts unknown and uncertain, because all the previous studies looked only at a single rig, and yet we know that even that single rig caused the deflection of whales, which had a significant impact on the subsistence hunting activities and increased the risk to the whaling captains and their crews. So with that, I'd like to leave just a little bit of time for my co-counsel. Thank you. I will give you two minutes. Thank you, Your Honor. I'd just like to touch briefly on three issues. First, following up on what the discussion my counsel had regarding the multi-cell EIS, and I do, Mr. Parker invited the court to take a close look at that, and I would invite the court to do so as well, because the government's suggestion that that document says that there are no significant impacts, there could never be significant impacts to whales from these types of activities is not correct. It does recognize that there can be significant impacts, and it depends on the whales present. Mothers with calves are particularly sensitive to noise. There's a risk that mothers can be separated from calves. Excluding calves and mothers or pregnant females from feeding areas is also a particular concern. These are the type of things that should have been discussed in the EA, but were not. Second, the government states that the required information, that it evoked a waiver to allow Shell to go ahead without providing the required information. However, there's nothing, the government has never alleged that before. There's nothing in the decision document that specifically evokes the waiver process. So it's not clear that the government, in fact, used that waiver process here. Third, I'd just briefly like to mention the fact that Mr. Parker says that this is a temporary thing that only happens during part of the year, and then it's plugged and left. But the effects themselves can indeed linger. The part of the year when this activity is happening happens to be the part when there's the most use by various sensitive wildlife species, in particular bowhead whales. In addition, one of our allegations is that this environmental assessment needed to look at the potential for oil spills. An oil spill in this area could have potentially devastating impacts that would linger, but are not small and short-term. Thank you, counsel. The case just argued will be submitted. The Court will stand in recess for the day.
judges: Nelson, Reinhardt, Bea